NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

SHAWNA N., JOHN N., *Appellants*,

*v.*

DEPARTMENT OF CHILD SAFETY, H.N., *Appellees*.

No. 1 CA-JV 18-0255
FILED 1-14-2020

Appeal from the Superior Court in Maricopa County
No.   JD528054
The Honorable David J. Palmer, Judge

**AFFIRMED**

COUNSEL

The Stavris Law Firm, PLLC, Scottsdale
By Alison Stavris
*Counsel for Appellant Shawna N.*

Denise L. Carroll, Esq., Scottsdale
By Denise Lynn Carroll
*Counsel for Appellant John N.*

Arizona Attorney General's Office, Mesa
By Amanda Adams
*Counsel for Appellee DCS*

---

**MEMORANDUM DECISION**

Presiding Judge Diane M. Johnsen delivered the decision of the Court, in which Judge Michael J. Brown and Judge Samuel A. Thumma joined.

---

**J O H N S E N**, Judge:

¶1 Shawna N. ("Mother") and John N. ("Father") appeal the superior court's order terminating their parental rights to their daughter, H.N. For the following reasons, we affirm.

## FACTS AND PROCEDURAL BACKGROUND

**A. Events Preceding the Dependency.**

¶2 Mother and Father are the natural parents of H.N., born in December 2006.[1] H.N. was born with special needs, including a feeding aversion, gastroesophageal reflux disease, and problems with eye and motor coordination. She showed developmental delays within her first year of life and was diagnosed with oculomotor apraxia and mild hypotonia (low muscle tone). Mother obtained mental-health services for H.N. through Touchstone, and feeding, speech, and occupational therapies through the Division of Developmental Disabilities of the Arizona Department of Economic Security ("DDD"). Mother also obtained an individualized educational program for H.N. through her school. As time progressed, doctors told Mother that H.N.'s conditions improved or remained stable, but Mother displayed extreme anxiety over H.N.'s health and repeatedly presented her for treatment by various doctors and hospitals.

¶3 Over the first seven years of H.N.'s life, Mother brought her to emergency rooms more than two dozen times, citing issues such as constipation, diarrhea, vomiting, feeding aversion, poor weight gain, cough, dehydration, fever or abdominal pain. Because Mother often exaggerated H.N.'s symptoms, when doctors examined H.N., they tended not to see the symptoms Mother had reported, nor were they able to confirm them with medical testing. Mother also persistently advocated for

---

[1] The parents also have two older children who are not subject to a dependency.

an escalation in H.N.'s medical care, despite contrary recommendations by medical providers. Although not recommended by medical providers, Mother consistently urged doctors treating H.N. to perform invasive procedures including a port-a-cath (an indwelling catheter), a G-J tube (a feeding tube that bypasses a portion of the gastrointestinal tract) and total parenteral nutrition (receiving all nutrition intravenously). The procedures Mother wanted for her daughter carried significant risks, including complications from surgery, infection, blood clots, blood-glucose issues and liver dysfunction. Mother ultimately convinced a surgeon to place a port-a-cath in H.N. by stating that her primary care physician, Dr. Saba, agreed. The records, however, did not contain a note documenting that Dr. Saba had recommended installing a port-a-cath. Mother admitted after the port was placed that it "was a decision that she came to independently because she did not want [H.N.] to have to get poked while inpatient and to be used for IV fluids while she is inpatient."

¶4            In July 2010, several of H.N.'s medical providers met with Mother and Father to discuss Mother's overutilization of medical care for her daughter. They suggested Mother seek counseling for herself and respite care through DDD services and gave the parents concrete guidelines for when they should seek medical care for H.N. Father said he agreed that Mother had very high anxiety regarding H.N. and that, at times, he had told Mother not to bring H.N. to emergency rooms. Yet Father denied that Mother needed counseling and did not intervene by preventing Mother from taking H.N. for medical care.

¶5            Mother did not obtain any services for herself and continued to bring H.N. to the hospital for the same issues. Mother's actions resulted in reports of neglect to the Department of Child Safety ("DCS") in 2010 and 2011. DCS, however, did not substantiate the allegations in either report.

## B.      The Dependency.

### 1.      The child comes into DCS care.

¶6            In August 2014, Mother and Father brought H.N. to Phoenix Children's Hospital ("PCH") to be treated for an infection. Medical personnel again raised concerns about medical child abuse, and Dr. Lisa Kirsch, interim division chief of PCH's child protection team, completed an inpatient consultation with H.N. In reviewing H.N.'s medical records, Dr. Kirsch noted there had been concerns about "an excessive number of hospital admissions, and an excessive number of emergency department visits as well. And . . . there were requests for escalation in [H.N.'s] medical

care and for procedures to be done that the treating team didn't feel were medically warranted." Dr. Kirsch recommended making a report to DCS, which began an investigation.

¶7            DCS also was concerned about psychological issues Mother's behaviors were causing for the child. For instance, when Mother was in H.N.'s hospital room, H.N. would complain of abdominal pain, but when Mother was not in the room, H.N. did not report pain and told a hospital psychologist that Mother would allow her to eat only applesauce because she did not want H.N. to get fat, and that Mother becomes angry at her when she asks for food. H.N. also reported that Mother had told her not to eat in front of the psychologist. For her part, Mother told the psychologist that H.N. had never eaten solid food before and she did not want to "'force' [H.N.] to eat because she [did not] want to be 'the bad guy.'" The DCS investigation revealed Mother often thwarted H.N.'s progress by not following medical instructions regarding her feeding. The DCS investigation also revealed that H.N. had made a lot of progress in an inpatient feeding program the year before but quickly regressed when returned to Mother's care.

¶8            DCS took custody of H.N. in September 2014 and filed a dependency petition alleging neglect. The superior court found H.N. dependent as to both parents and adopted a case plan of family reunification. The ensuing dependency lasted almost four years, during which DCS provided the parents with several services, including parent-aide services, supervised visitation, a neuropsychological examination for Mother, psychological evaluations, individual counseling, marriage counseling and therapeutic visits.

## 2.        Initial evaluations.

¶9            DCS asked Dr. Kirsch to review H.N.'s medical records to determine whether they substantiated medical child abuse. In a letter dated March 6, 2015, Dr. Kirsch explained that the child had significant medical problems as an infant and young child, and Mother responded appropriately in seeking care for those issues. As H.N. grew older, however, Mother repeatedly asked for interventions for H.N. that medical providers did not think were medically warranted, including multiple hospital admissions for remedies that medical providers recommended be done on an outpatient basis, installation of a port for the administration of IV fluids, and installation of a G-tube for feeding. Dr. Kirsch concluded that "[t]he most compelling evidence" of medical child abuse was that after H.N. came into DCS's care, she no longer manifested gastrointestinal complaints.

Indeed, the child began eating solid foods with no complaints of abdominal pain or discomfort, constipation or dehydration. By November 2014, she was consuming all foods and liquids by mouth. As a result, the G-tube and port were removed in January 2015. Nevertheless, the child sometimes exhibited anxious behaviors with new foods and continued to have some general feeding issues.

¶10　　　By April 2015, the parents had completed their first psychological evaluations. Mother's evaluating psychologist diagnosed her with post-traumatic stress and anxiety disorders and recommended Ph.D.-level counseling and a psychiatric evaluation. Father's evaluating psychologist concluded that "a child placed in [Father's] care and custody is likely at risk due to ongoing failure to protect [H.N.] from unnecessary medical intervention." The psychologist recommended individual counseling and supervised visits, noting also that Father "might benefit" from counseling with H.N., marriage counseling with Mother and parenting classes.

¶11　　　DCS then consulted with Dr. Brenda Bursch, professor of psychiatry and pediatrics at the University of California Los Angeles and an expert in medical child abuse, who reviewed H.N.'s medical records and evaluated Mother in June 2015. In her interview with Dr. Bursch, Mother said that she had anxiety and related that Father had issues with anger, irritability and control. Dr. Bursch concluded that Mother "clearly over utilized medical services and advocated for unneeded medical procedures for" H.N. She diagnosed Mother with "Illness Anxiety Disorder, care-seeking type, with panic attacks," which she later described as someone "having much more anxiety about either a symptom or the idea of a symptom than would match the severity of what's going on," along with associated behaviors. As a result, Dr. Bursch opined, Mother had exacerbated H.N.'s medical issues, distorted the child's self-perception and placed her at risk for serious mental and physical harm. At the same time, Dr. Bursch opined that Father's "unwillingness and/or inability to adjust his family role and behavior" to meet H.N. and Mother's needs appeared to contribute to H.N.'s "high health care utilization and over-medication." Specifically addressing the effects of the parents' behaviors on H.N., Dr. Bursch wrote:

> The concerning parental behaviors described in this report place [H.N.] at increased risk for clinicians to over-interpret symptoms and test results, to make decisions to conduct unnecessary tests and assessments, and to make decisions to recommend unnecessary treatments or procedures. This

places [H.N.] at risk for unpleasant, or even dangerous, side effects from unneeded evaluations and treatments, distress related to assessments and treatments (including the potential for post-traumatic stress disorder), distorted self-perceptions regarding her health and abilities, and a delay or thwarting of achieving developmental milestones in a timely manner.

\*      \*      \*

[Mother] struggles to see her own role in over-medicalizing [H.N.]  She admits that she brought [H.N.] in too frequently, but quickly reverts to externalizing blame.  [Father] has not accepted his role in their current situation . . . . While [Mother] may have been trying her best to obtain assistance that she felt she needed, neither she nor her husband recognized and/or appropriately responded to the potential danger [H.N.] was exposed to and the level of disability they were creating in her. . . .   In fact, it is likely that [Mother] has become a symptom trigger for [H.N.], making it even more difficult for her to make progress with her oral intake and emesis. . . . Neither parent has fully acknowledged the suffering they have caused [H.N.] and the family.

¶12            Dr. Bursch recommended a neuropsychological assessment for Mother, individual and marriage counseling for both parents, and therapeutic supervised visitation with H.N.  She also emphasized that for H.N. to safely return home, both parents would need to "significantly increase[] their insight into their concerning behaviors and [make] meaningful progress in altering those behaviors."  She defined "meaningful progress" as

(1) admitting to [their] (intentional and/or unintentional) problematic behaviors . . . and being able to describe specifically how those behaviors placed [H.N.] at risk, (2) experiencing an appropriate emotional response to those behaviors, the harm caused by the behaviors, and the potential harm the behaviors could have caused, (3) developing effective strategies to better manage personal emotional needs, and (4) demonstration of these skills, with monitoring, over a period of time.

¶13            In November 2015, Mother completed a neuropsychological evaluation with Dr. John Mather, who concluded that she has a

neurocognitive disorder and a learning disorder and recommended that she participate in individual and marriage counseling.

### 3. Placement and therapeutic visits through January 2016.

¶14 Once H.N. was removed from her parents, she showed significant improvement. DCS continued the services that Mother had established for H.N. and added individual counseling and periodic child- and family-team meetings. Additionally, in September 2015, H.N. started trauma therapy with Carol Melim. H.N. began eating solid foods, her medications were reduced to two from ten, and eventually she was able to have her G-tube and port-a-cath removed. H.N. no longer needed a specialized stroller that she had used in Mother's care.

¶15 Meanwhile, Mother and Father participated in therapeutic supervised visits with H.N. through Southwest Human Development ("SWHD") intermittently between December 2014 and February 2016. The parents gained some insight, but the SWHD therapists reported several remaining concerns throughout the sessions. Because H.N. demonstrated increasingly troubling behaviors before and after the visits, the court suspended them in February 2016.

### 4. Marriage counseling and visits through September 2016.

¶16 By January 2016, DCS developed concerns about domestic-violence issues between Mother and Father. Nonetheless, the parents engaged in marriage counseling from May 2016 to July 2017. Although the parents successfully completed counseling, Father continued to have angry outbursts during counseling sessions.

¶17 Therapeutic visits with H.N. briefly resumed in May 2016, but the professional visitation team concluded after a visit on July 1 that the visits were causing H.N.'s eating habits to regress. Indeed, she was eating so little that she had to be hospitalized. Therapists reported that Mother and Father were unable to provide H.N. acknowledgment and empathy for her past experiences. Because H.N.'s behaviors and emotional health had regressed, SWHD reported that "[r]eunification is not recommended." In July 2016, the court again suspended the parents' visits. In August, Dr. Bursch reviewed the parents' progress and endorsed changing the case plan to severance and adoption.

¶18 In the hospital, doctors installed an NG tube, but H.N. displayed very defiant behaviors and kept removing it in the hospital. Medical staff determined H.N.'s issues were psychological in nature and

transferred her to the psychiatric care unit, where she began seeing trauma therapist Patrick Goodman. H.N. also was assigned a high-needs case manager and completed a neuropsychological examination that resulted in a recommendation for therapy (which Goodman provided). Eventually, H.N. stabilized and was released to a foster family with whom she had been placed shortly before her hospitalization. The new foster parents specialized in caring for children who are medically fragile, developmentally delayed or diagnosed with Reactive Attachment Disorder.

### 5. Severance and adoption.

**¶19** No longer allowed to visit H.N., the parents began writing letters to her in October 2016. Two months later, at the request of DCS, the court changed the case plan to severance and adoption, and DCS moved to terminate Mother and Father's parental rights on grounds of abuse, neglect, and 15 months' out-of-home placement, and on the additional ground of mental health for Mother. *See* Arizona Revised Statutes ("A.R.S.") section 8-533(B)(2)-(3), (8)(c) (2020).[2] In February 2017, the parents were allowed supervised telephonic visits with H.N. Later that month, in-person SWHD therapeutic visits resumed, but H.N.'s problematic behaviors returned and, according to her foster parent, they "progressively got worse." H.N. vomited before entering Goodman's office to participate in a telephonic visit, and over time after the in-person visits resumed, she began to soil herself, smear her feces about, vomit more and disconnect "her feeds."

**¶20** In May 2017, Dr. Mather performed another neuropsychological examination of H.N. He diagnosed H.N. with an Unspecified Neurodevelopmental Disorder, an Unspecified Neurocognitive Disorder, a Developmental Coordination Disorder, a Language Disorder, Unspecified Trauma and Stressor Related Disorder, and three learning disorders. In August 2017, therapeutic visits increased in frequency, and H.N.'s behaviors worsened still. At the same time, SWHD therapists continued to note that the parents had not taken sufficient responsibility for their role in H.N.'s out-of-home placement and were unable to consistently provide H.N. with empathy.

**¶21** In November 2017, H.N. stated she no longer wanted contact with her parents, and, on Goodman's advice, DCS discontinued all contact between them and H.N. a few weeks before the severance hearing was to

---

2       Absent material revision after the relevant date, we cite the current version of a statute or rule.

begin. Around that same time, Dr. Bursch conducted a final evaluation of the parents' progress. She concluded they had made only "partial meaningful progress" and noted remaining concerns about the parents' ability to meet H.N.'s needs in the future.

¶22 The superior court heard testimony in the termination proceeding over 21 days between November 2017 and March 2018, and ultimately terminated Mother and Father's parental rights on the grounds alleged. The parents timely appealed. We have jurisdiction pursuant to Article 6, Section 9, of the Arizona Constitution, and A.R.S. §§ 8-235(A) (2020) and 12-120.21(A)(1) (2020).

## DISCUSSION

¶23 "Although a parent's right to care, custody, and control of his or her children has long been recognized as fundamental, it is not absolute." *Linda V. v. Ariz. Dep't of Econ. Sec.*, 211 Ariz. 76, 78, ¶ 6 (App. 2005) (citations omitted). The fundamental right to parent may be terminated under "statutorily enumerated conditions after following specified procedures." *Id.* To justify such termination, the superior court must find, by clear and convincing evidence, the existence of at least one ground set forth in § 8-533. *Michael J. v. Ariz. Dep't of Econ. Sec.*, 196 Ariz. 246, 249, ¶ 12 (2000). Additionally, the court must find by a preponderance of the evidence that termination is in the best interests of the child. *Trisha A. v. Dep't of Child Safety*, 247 Ariz. 84, 87, ¶ 14 (2019).

¶24 We view the evidence in a severance case in the light most favorable to sustaining the superior court's findings and will affirm unless, as a matter of law, no reasonable fact-finder could have found the evidence satisfied the applicable burden of proof. *See Denise R. v. Ariz. Dep't of Econ. Sec.*, 221 Ariz. 92, 95, ¶ 10 (App. 2009). We review *de novo*, however, the superior court's interpretation of a statute. *See Linda V.*, 211 Ariz. at 78, ¶ 7.

## A. Father's Challenge to Admissibility of Evidence.

¶25 As an initial matter, Father argues he was denied due process when the superior court "allowed hearsay statements in medical and court reports into evidence and relied on those statements" even though the authors of the reports were not present at the termination hearing.

¶26 The superior court has "broad discretion in admitting or excluding evidence, and [this court] will not disturb its decision absent a clear abuse of its discretion and resulting prejudice." *Lashonda M. v. Ariz. Dep't of Econ. Sec.*, 210 Ariz. 77, 82-83, ¶ 19 (App. 2005). Due process

requires the opportunity to be heard in a meaningful time and in a meaningful manner. *Wallace v. Shields*, 175 Ariz. 166, 174 (App. 1992). Arizona Rule of Procedure for the Juvenile Court 44(B)(2)(e) requires a party objecting to an exhibit to file a notice of objection and the specific grounds for each objection within ten days of a pretrial disclosure statement. It also provides that "[s]pecific objections or grounds not identified in the notice of objection shall be deemed waived, unless otherwise ordered by the court." Ariz. R.P. Juv. Ct. 44(B)(2)(e).

¶27        Here, DCS filed its initial disclosure statement for the termination proceeding on June 16, 2017, listing "[a]ll DCS Court Reports" and medical records from a number of hospitals and health-care providers. Father waived any objection to the exhibits' admissibility by failing to file a notice of objection. *See Alice M. v. Dep't of Child Safety*, 237 Ariz. 70, 72-73, ¶¶ 9-11 (App. 2015).[3]

**B.        15-Months' Out-of-Home Care.**

¶28        The superior court may terminate parental rights if (1) DCS "made a diligent effort to provide appropriate reunification services," (2) "[t]he child has been in an out-of-home placement for a cumulative total period of fifteen months or longer pursuant to court order," (3) "the parent has been unable to remedy the circumstances that cause the child to be in an out-of-home placement," and (4) "there is a substantial likelihood that the parent will not be capable of exercising proper and effective parental

---

[3]        Even if Father had not waived his objections, his argument fails. His brief fails to specify most of the exhibits he apparently challenges. He generally complains that the court admitted H.N.'s medical records, but he does not argue why those records did not satisfy Ariz. R. Evid. 803(6) (under business-records exception to rule against hearsay, "regardless of whether the declarant is available as a witness," documents are admissible when certified under Arizona Rule of Evidence 902(11) or (12) or supported by testimony of qualified witness). The same is true with respect to reports by DCS workers that were allowed in evidence. With respect to Exhibit 47, the lone set of records he mentions that was not accompanied by a certification that complied with Rule 803(6), Father does not say how he was prejudiced or deprived of a fair trial by that report. Finally, although Father complains that DCS failed to call the medical personnel identified in the various reports to testify, he does not explain why he could not have done so.

care and control in the near future."    A.R.S. § 8-533(B)(8)(c).[4]
"[C]ircumstances" means "those circumstances existing at the time of the severance that prevent a parent from being able to appropriately provide for his or her children." *Marina P. v. Ariz. Dep't of Econ. Sec.*, 214 Ariz. 326, 330 (App. 2007) (quotation omitted).

> ### 1.    Diligent efforts to provide appropriate reunification services.

**¶29**    Mother and Father argue that insufficient evidence supports the superior court's finding that DCS made diligent efforts to provide them appropriate reunification services.  Specifically, the parents assert that DCS unduly delayed their marriage-counseling referral, delayed H.N.'s neuropsychological evaluation until 2017 and failed to provide them with family and feeding therapies with H.N.

**¶30**    DCS fulfills its statutory obligation when it provides a parent with "the time and opportunity to participate in programs designed to help her become an effective parent." *Maricopa County Juv. Action No. JS-501904*, 180 Ariz. 348, 353 (App. 1994).  DCS "is not required to provide every conceivable service or to ensure that a parent participates in each service it offers." *Id.*  Neither is DCS required to undertake futile rehabilitative measures, although it should undertake rehabilitative measures that have "a reasonable prospect of success." *Mary Ellen C. v. Ariz. Dep't of Econ. Sec.*, 193 Ariz. 185, 192, ¶ 34 (App. 1999).

**¶31**    In a detailed 39-page ruling, the superior court expressly addressed each of the parents' concerns about services, and reasonable evidence supports its findings. *See Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 282, ¶ 12 (App. 2002) (this court does not reweigh evidence on appeal).

**¶32**    Father argues that DCS did not provide the parents with marriage counseling until mid-2016, nearly two years into the dependency. The superior court found that although counseling "could have been put into place sooner, . . . there were legitimate concerns surrounding the timing of such counseling caused by [d]omestic [v]iolence between the parents, caused largely by the Father.  Secondly, the need for Ph.D. level counseling

---

[4]    Although the parents challenge the termination on each ground, this court may affirm the judgment if clear and convincing evidence supports a single ground for termination. *See Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 280, ¶ 3 (App. 2002).

was also a legitimate concern." The parents' individual counselors recommended marriage counseling in November 2015, but Dr. DiBacco, the DCS unit psychologist, noted concerns about domestic violence between the parents and advised that marriage counseling be postponed. These concerns escalated when Mother and Father engaged in a domestic-violence incident after a January 2016 visit with H.N. in which Father physically shook Mother and shouted at her. Mother then expressed her intent to leave Father, which would have obviated the need for marriage counseling, but she later changed her mind. Later in January 2016, Dr. DiBacco met with the parents' therapists and approved the marriage-counseling referral. The referral was further delayed, however, because it was first assigned to Father's individual therapist and had to be reassigned because of a conflict of interest. Marriage counseling then began in earnest in June 2016 and continued through July 2017. The record thus shows that the parents received more than a year of marriage counseling. Given the domestic-violence issues between the parents that had been observed repeatedly during therapeutic visits with H.N., reasonable evidence supports the court's finding that the delay in providing that counseling was reasonable.

¶33 The parents generally criticize the behavior-based psychological services DCS arranged for H.N. and argue that she needed neuropsychological services. In support of this contention, the parents offered the opinion of Dr. Scialli, who concluded that the child's issues were "likely brain based and not behavioral nor induced by an incompetent mother or one with bad intent." H.N. completed a neuropsychological evaluation in August 2016, and the evaluator recommended therapy (which Goodman provided) and a follow-up evaluation in a year (which Dr. Mather performed in May 2017). Based on the follow-up evaluation, Dr. Mather concluded that H.N. had Unspecified Neurodevelopmental and Neurocognitive Disorders and learning disorders. An MRI performed shortly after Dr. Mather's evaluation, however, ruled out Dr. Mather's concerns that a purely neurological basis could explain all of H.N.'s behaviors. Although the parents offered expert testimony to the contrary, the record contains sufficient evidence to support the court's findings and its conclusion that DCS acted reasonably in providing H.N. services, including behavior-based therapy.

¶34 The parents also argue that DCS should have provided them and H.N. with family and feeding therapies. The record, however, does not support the parents' assertion that family therapy would have been appropriate under the circumstances. Goodman testified that H.N. was never ready for family therapy: Based on his review of the records, "it was

not [his] opinion that Mother and Father would be able to engage [H.N.] in family therapy in a way that would be productive." Even so, the parents were allowed to interact with H.N. in a therapeutic setting during visits in which masters-level therapists gave them real-time feedback on how to better understand and respond to H.N.

¶35 Additionally, the record shows H.N. received feeding therapy until she was hospitalized in July 2016. During that hospitalization, H.N.'s eating therapist refused to treat her any further because her behaviors were "beyond [the therapist's] abilities" and the doctors determined that H.N.'s issues were not mechanical but were psychological. The specialists involved in H.N.'s care searched for a feeding-therapy program, but H.N.'s age and cognitive ability prevented her from being admitted to any of them. Furthermore, a psychiatrist treating H.N. during her hospitalization noted that although feeding therapy was important, in this case, it "should be secondary to trauma therapy." The search for a feeding therapy program continued and by the time of the severance trial, H.N. was on a wait list for one program. This record reasonably supports the court's finding that although DCS was not able to offer the parents "every conceivable service," it made a diligent effort to provide the family with services designed to address the underlying issues causing H.N.'s out-of-home placement.

¶36 Finally, Mother argues DCS failed to provide appropriate services because it was distracted by a "non-diagnosis" of "Munchausen by proxy" in one of the early evaluations of H.N. Mother does not develop this argument by providing record citations to support her assertion, however. *See* ARCAP 13(a)(7). In any event, we note that although in August 2015, Dr. Bursch gave a "rule out" diagnosis of factitious disorder imposed upon another because Mother had "engage[d] in some behaviors" that met the diagnostic criteria, Dr. Bursch did not elevate this to a full diagnosis. More broadly, as the superior court found, regardless of a formal diagnosis, the "parents clearly committed 'medical child abuse' upon" H.N. The court explained that the parents caused a "dramatic, patently unreasonable over-medicalization of [H.N.]," which in turn "caused severe damage to the parent child relationships here."

### 2. The parents' inability to remedy the circumstances causing out-of-home placement.

¶37 The parents also challenge the court's finding that they were unable to remedy the circumstances causing H.N.'s out-of-home placement. Mother points to Dr. Bursch's conclusions that she did not intend to harm H.N., had made partial meaningful progress in services, and had the

potential to make further progress. Mother also argues that she was not allowed to show that she had made the requisite behavioral changes because she was not allowed "hands on interaction" with the child. For his part, Father argues he participated in more than 81 counseling sessions and completed all his treatment goals. He also points out that his individual therapist, Ms. Hancock, confirmed that he had developed coping mechanisms and made behavioral changes. Further, the parents' marriage counselor, Dr. Houston, testified they had successfully completed counseling.

¶38 These arguments, however, disregard substantial evidence in the record supporting the superior court's finding that "without any question," the parents were unable by the time of the severance hearing to make the behavioral changes required to safely parent H.N. In support of that finding, the record showed that, notwithstanding three years of services, the parents were unable to fully acknowledge their roles in the over-utilization of medical care and the severe physical and emotional effects it had on H.N. Because they could not acknowledge what they had done, they were unable to show H.N. proper empathy for what she experienced as a result of their conduct. Specifically, Dr. Bursch noted the parents did not "appreciate the impact of the fear and anxiety [H.N.] suffered due to her numerous hospitalizations and other medical interventions." Nor were the parents able to properly respond to [H.N.'s] "statements to them during visits about their arguing, being spanked while in their care, and/or not being fed like her siblings." Instead, the parents often denied H.N.'s perception of reality, "rather than try to understand and learn from her memory of her experience with them."

¶39 Dr. Bursch testified that the specific behavioral changes she set out for the parents in her initial evaluation in August 2015, *see supra* ¶ 12, were based on "research on recidivism for child abuse" and would be relevant in determining "whether or not a child is safe to be reunified with [her] famil[y]." She elaborated, "There are really two hallmarks. One is empathy for what the child suffered and the other is acknowledging [the parents'] behavior" that contributed to the child's suffering. In her final evaluations of the parents, Dr. Bursch concluded that they had made only "partial meaningful progress" towards those goals and listed several remaining concerns, including that "there's still not an appreciation for the complexities of [H.N.'s] problem and their part in it and not full acknowledgment of . . . how some of their behaviors impacted [H.N.] and a lack of a true appreciation for her suffering."

¶40          The visitation records support Dr. Bursch's conclusions. The SWHD therapists expressed concerns regarding the parents' interactions with H.N. during visits, including that Mother was treating H.N. as if she were much younger than her actual age, interacted with H.N. in an intrusive, controlling manner, and was unable to take full responsibility for her past actions. The therapists also noted that Father was resistant to feedback, wavered in his ability to take responsibility for his past actions, and demonstrated increasingly concerning behaviors toward H.N. and Mother consistent with the "power and control" dynamics of domestic violence. Indeed, therapists recorded that during feedback after a visit in January 2016, Father became "intimidating [with Mother]. He was standing over her. He was yelling at her, demeaning her[], shaking her physically. All of those are characteristics of a power and control relationship." During therapeutic visits, Father "snapped his fingers in [H.N.'s] face, ignored her completely when unhappy with her, and forced her to eat or talk about unpleasant things."

¶41          The reports noted both parents were putting their own emotional needs ahead of those of H.N., and those concerns remained throughout the visitation process. Indeed, at the termination hearing, the parents' testimony evidenced Dr. Bursch's concerns. Mother testified she could understand how DCS believed she had over-utilized medical care for H.N. but insisted she "was just following doctor's orders and doing what they asked." Father testified he felt H.N. never should have been removed from their care and that Mother could independently parent H.N. without any oversight in the future.

¶42          The court also heard evidence showing the harm H.N. had suffered as a result of her parents' conduct and behaviors. H.N. repeatedly expressed fear of Mother and Father – fear that they would kill her, take her back to the hospital, fight with each other and spank her. She consistently expressed fear about going home to live with them. In therapy, H.N. blamed herself for needing a G-tube when she was only seven months old, and believed that "if she ate, she would get fat" and "to be loved [by her parents], she had to be the sick child." She demonstrated increasingly troubling behaviors each time in-person visits resumed, including "disconnecting her feeds," dissociation, aggression, dark-themed play, uncontrolled vomiting, emotional distress, cruelty to animals, enuresis and smearing feces. These behaviors improved each time the court suspended visits.

¶43          Given the dramatic effects that the visits caused H.N., Dr. Bursch concluded that the parents retained unrealistic expectations about

what would happen if H.N. were allowed to return home. Dr. Bursch opined, "Neither parent expressed concerns for how extremely physically and emotionally difficult a reunification attempt might be on [H.N.] They do not anticipate her to experience a high level of emotional, behavioral and physical distress and do not appear to be prepared for this possibility." Both parents stated that upon reunification, they would not rely upon H.N.'s doctors to determine the correct level of medical intervention for her. Mother even suggested that she would rely on H.N. to make medical decisions, such as when to stop feeds. Dr. Bursch concluded based on the records and her interviews with the parents that H.N. could not safely be reunified with them at the time of the severance hearing.

¶44        In sum, although the parents made some meaningful progress over the three-and-a-half-year dependency, reasonable evidence supports the court's finding that they were unable to remedy the circumstances causing H.N.'s out-of-home placement.

### 3. Substantial likelihood that the parents will not be capable of exercising effective parental care and control in the near future.

¶45        The evidence recounted above also supports the superior court's conclusion that the "cold hard facts" show that Mother and Father will not be capable of exercising proper and effective parental care and control in the near future. As noted, at the time of the severance hearing, the parents continued to lack the insight and behavioral skills required to safely reunify with H.N. Goodman testified that any reunification attempt would require "a significant period of transition" with multiple support services. Dr. Bursch likewise concluded:

> Based on [H.N.'s] physical and emotional responses to increased contact and the idea of reunification, it is expected that a successful reunification would likely take a significant amount of time and require intensive therapeutic support be provided to [H.N.] and her parents. If the court proceeds with reunification, all involved parties should expect that it could take up to two years. Additionally, her symptoms may become so severe as to require multidisciplinary inpatient treatment for her rehabilitation. Additionally, it is possible that, despite everyone's best efforts, [H.N.] will be unable to safely tolerate the reunification attempt.

## C.    Best Interests.

¶46        The parents finally argue that insufficient evidence supports the superior court's finding that severance is in H.N.'s best interests.

¶47        Once the court finds a statutory ground for termination, "the interests of the parent and child diverge," and the court proceeds to balance the unfit parent's "interest in the care and custody of his or her child . . . against the independent and often adverse interests of the child in a safe and stable home life." *Kent K. v. Bobby M.*, 210 Ariz. 279, 286, ¶ 35 (2005). "[A] determination of the child's best interest must include a finding as to how the child would benefit from a severance or be harmed by the continuation of the relationship." *Maricopa County Juv. Action No. JS-500274*, 167 Ariz. 1, 5 (1990). Courts "must consider the totality of the circumstances existing at the time of the severance determination, including the child's adoptability and the parent's rehabilitation." *Alma S. v. Dep't of Child Safety*, 245 Ariz. 146, 148, ¶ 1 (2018). Relevant factors in this determination include whether the current placement is meeting the child's needs, an adoption plan is in place, and the child is adoptable. *Demetrius L. v. Joshlynn F.*, 239 Ariz. 1, 3-4, ¶ 12 (2016). Although a factor to consider, a bond between the parent and child is not dispositive of best interests. *See Dominique M. v. Dep't of Child Safety*, 240 Ariz. 96, 98-99, ¶ 12 (App. 2016).

¶48        The superior court found that although Mother and Father love H.N., maintaining a parent-child relationship would be detrimental to H.N. because "there are simply no reasonable prospects of reunification of [her] and parents at any time in the foreseeable future" and further reunification attempts would delay "permanency [for H.N.] that has been delayed for much, much too long." Reasonable evidence, including much of that recounted above, supports these findings.

¶49        At the severance hearing, Goodman emphasized H.N.'s need for permanency: "I think that part of what is most difficult for [H.N.] is that she doesn't know what her future is. . . . [She] has been away from permanency for multiple years. . . . [T]he play [therapy] that she's been playing out over the last eight, nine months – the theme is consistently about not having a home of her own." Goodman also testified that "not having a sense of permanency, at this point, is significantly traumatizing for" H.N.

¶50        The court also found that H.N. would benefit from severance because it would allow her to progress towards permanency. Her foster parents are specially trained to meet her complex needs and address her

often difficult behaviors, and H.N. had developed a bond with her foster siblings. H.N.'s foster family wished to adopt her and planned to allow future contact between H.N. and her parents if H.N. wanted the contact and if it was therapeutically advisable. Thus, reasonable evidence supports the superior court's best-interests finding.

## CONCLUSION

¶51 For the reasons stated, we affirm the superior court's termination order.

